**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF KENTUCKY**
**LOUISVILLE DIVISION**

**CIVIL ACTION NO. 06-133-C**

**JORGE L. ROBERTS** and
**LASHAUNA HARRIS,**                                                                       **PLAINTIFFS,**

**V.**                              **MEMORANDUM OPINION AND ORDER**

**LOUISVILLE/JEFFERSON COUNTY**
**METRO GOVERNMENT, ET AL.,**                                              **DEFENDANTS.**

**\* \* \* \* \* \* \* \* \* \* \***

This matter is before the court on the motion for summary judgment filed by

defendant Officer Donald Hargadon (DE 15), and the motions to dismiss and for

summary judgment filed by defendants Louisville Metro Police Department and

Louisville-Jefferson County Metro Government (DE 16).  The court, having

reviewed the record and being otherwise advised, will deny Hargadon's motion for

summary judgment (DE 15) and grant Louisville Metro Police Department's and

Louisville-Jefferson County Metro Government's motions to dismiss and for

summary judgment (DE 16).

**I.     BACKGROUND**

Defendant Donald Hargadon has been a police officer since 2000, first with

the City of Louisville Police Department, and then with the defendant Louisville

Metro Police Department.  At about 4:30 A.M. on March 13, 2005, Hargadon

began following a Ford pickup truck driven by plaintiff Jorge Roberts, who was

driving plaintiff LaShauna Harris back to her home.  Shortly after he began

following Roberts's truck, Hargadon turned on his video camera, which recorded most of the relevant subsequent events.

Less than two minutes after starting the video recording, Hargadon turned on his police lights and Roberts pulled his truck over to the shoulder of the road.  In his deposition, Roberts admitted that he was speeding, that he "swerved over a little bit," that he ran at least one red light, and that Hargadon was probably justified in pulling him over, *see* DE 16-3 at 21, DE 15-4 at 25-26; therefore, the plaintiffs do not dispute the defendants' assertion that Hargadon had probable cause to make this traffic stop.  After Roberts's truck stopped, the parties agree that Hargadon approached the passenger side of the truck, where he rapped on the window and ordered Roberts to leave the truck.  The parties also agree that Hargadon then told Roberts to put his hands on the truck and Roberts complied.  The parties also agree that a struggle then took place between Roberts and Hargadon, and that Harris subsequently left the truck and attempted to intervene in the struggle.  After additional police officers arrived, the parties agree that Roberts and Harris were arrested.

Following an internal investigation, Colonel Robert White, the Chief of the Louisville Metro Police Department, suspended Hargadon without pay for 10 days for his conduct during this incident.  More specifically, White concluded that Hargadon's conduct was "improper" because he broke three standard police procedures: first, by using "improper force in [his] contact with Mr. Roberts and

2

Ms. Harris"; second, by calling "Mr. Roberts an idiot"; and third, by using tactics

inconsistent with the department's strategy and tactics of patrol stops.  (DE 16-6

at 1.)  Beyond this report and the agreed facts discussed above, the plaintiffs and

Hargadon have provided substantially different accounts of this incident.[1]

    According to the plaintiffs, Hargadon may have pointed his weapon at

Roberts while ordering him to place his hands on the truck.[2]  (DE 19-1 at 6.)  The

plaintiffs also claim that while ordering Roberts to spread his legs, Hargadon began

kicking Roberts, and that when Roberts objected, Hargadon "body slammed

Roberts" and attempted to fling him around on the ground, although Roberts

repeatedly stated that he did not intend to resist.  *Id.*  The plaintiffs claim that

Hargadon then began striking Roberts, that Harris left the truck and attempted to

intervene, and that Roberts managed to stand up and began resisting Hargadon.

After grappling with Hargadon "for a few seconds," the plaintiffs claim that Roberts

"terminated the altercation" and began to behave in a submissive manner,

whereupon Hargadon again brought Roberts to the ground and began striking him

anew.  *Id.* at 7.  Several minutes later, after another officer arrived on the scene,

the plaintiffs claim that Hargadon slammed Harris onto the hood of a police cruiser

_____

    [1]  Unlike Hargadon, Louisville-Jefferson County Metro Government and the
Louisville Metro Police Department do not contest the plaintiffs' more specific
characterization of the incident, claiming that the specific "facts surrounding the
struggle are irrelevant to [their] motions for summary judgment."  (DE 16-2 at 2.)

    [2]  The plaintiffs' characterization of most of these events is based on specific
citations to the videotape of the incident.

while she was in handcuffs.

According to the plaintiffs, as a result of this incident, Roberts has incurred significant medical treatment, including two shoulder surgeries, the total cost of which exceeds $45,000.  (DE 19-1 at 15, DE 21-14 at 1-9.)  While the plaintiffs concede that Harris's physical injuries were relatively minor, they contend that the experience was "utterly traumatic" for her as well, and they also claim that as a result of the wrongful charges filed after this incident, she was fired from a job when her background check was updated.  *E.g.,* DE 19-1 at 16.  The plaintiffs also rely on a report provided by an allegedly expert witness, Rodney Brewer, who concludes that Hargadon committed several tactical and courtesy infractions and acted in an "aggressive and disrespectful manner" during the incident.

According to Hargadon, and contrary to the plaintiffs' account, Roberts "exhibited an unwillingness from the beginning to comply with Officer Hargadon's directions[,]" and he did not comply with Hargadon's initial instruction to spread his legs apart.  (DE 15-2 at 2.)  Therefore, rather than kicking Roberts without provocation, Hargadon claims he merely used his own feet "to spread Roberts' legs so he [Hargadon] could frisk him [Roberts] and place him in handcuffs."[3]  *Id.* Hargadon also claims that despite his instructions, Roberts refused to put his hands down, whereupon he pushed Roberts on the ground and ordered him to lie flat so that he could be handcuffed.  Again, according to Hargadon, Roberts refused to

---

[3]  Like the plaintiffs, Hargadon makes specific citations to the videotape.

4

obey; instead, Hargadon claims Roberts began to shout expletives and fight, going so far as attempting to put Hargadon in a choke hold. *Id.* at 2-3. "As Roberts was continuing to resist arrest," Hargadon claims, Harris exited the truck and ran to the skirmish, where, despite his orders to return to the truck, she began "screaming and pulling at him." *Id.* at 3. After a further struggle, back-up officers arrived and put both Roberts and Harris under arrest, and, according to Hargadon, Roberts bragged to the other officers that "he had gotten the better of Officer Hargadon in the fight and let him go." *Id.* In addition to this account and the videotape, Hargadon relies on a report provided by another allegedly expert witness, William Payne, who concludes that Hargadon used an "objectively reasonable" and "very low level of force" in his attempts to control both Roberts and Harris, who displayed various forms of interference and resistance. (DE 15-9 at 3.) Finally, Hargadon has provided several photographs of himself and of Roberts allegedly taken after the incident, which show a number of cuts and bruises on Hargadon's arms and legs and some smaller scrapes on Roberts's arms.

## II.    STANDARD OF REVIEW

"Summary judgment is proper where there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (citing Fed. R. Civ. P. 56(c)). A principal purpose of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323 (1986).  In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in favor of the opposing party.  *Id.*  A judge is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  A genuine issue exists only when there is sufficient evidence on which the jury could reasonably find for the opposing party.  *Browning*, 283 F.3d at 769 (quoting *Anderson*, 477 U.S. at 252).

The initial burden of showing the absence of a genuine issue of material fact is on the moving party.  *Celotex*, 477 U.S. at 323.  Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, "the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'"  *Id.* at 587 (quoting Fed. R. Civ. P. 56(e)) (emphasis in *Matsushita*).  Evidence that is "merely colorable, or is not significantly probative," is not sufficient to avoid summary judgment.  *Anderson*, 477 U.S. at 249 (internal citations omitted).  Furthermore, "the moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only 'show – that is, point out to the district court – that there is an absence of evidence to support the nonmoving party's case.'"  *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996) (quoting *Celotex*, 477 U.S. at 325).

6

Dismissal is proper where the movant establishes beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing a motion to dismiss, the court considers the pleadings in the light most favorable to the plaintiffs, and the factual allegations in the complaint are assumed to be true. *Jones v. Carlisle*, 3 F.3d 945, 947 (1993).

## III.   ANALYSIS

In their complaint, the plaintiffs allege that Hargadon's actions violated their rights to be free from false arrest, assault, battery, excessive force, cruel and unusual punishment, and the wrongful institution of criminal charges. According to the plaintiffs, they are entitled to damages for these actions under 42 U.S.C. § 1983 because Hargadon's actions constituted violations of the Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution. The plaintiffs also claim that they are entitled to damages for these actions under Kentucky law. Finally, the plaintiffs claim that Hargadon's actions and their injuries were the "direct and proximate result of the unlawful and unconstitutional" training, supervision, and disciplinary policies of another defendant, Louisville -Jefferson County Metro Government ("Metro"), and therefore, the plaintiffs conclude, Metro is also liable for Hargadon's actions. (DE 1-1 at 8.) These claims, and the arguments raised in the defendants' motions for summary judgment, are addressed

in more detail below.[4]

**A.    Metro's Motion To Dismiss in Part and for Summary Judgment**

**1.    Metro's Motion To Dismiss in Part**

Metro first argues that the plaintiffs' alleged violations of their rights

protected by the Fifth, Eighth, Ninth, and Fourteenth Amendments do not state

claims for which relief can be granted.  With respect to the plaintiffs' Fifth

Amendment claim, "[t]he Fourteenth Amendment's Due Process Clause restricts

the activities of the states and their instrumentalities; whereas the Fifth

Amendment's Due Process Clause circumscribes only the actions of the federal

government."  *Scott v. Clay County*, 205 F.3d 867, 873 n.8 (6th Cir. 2000).

Because the arrest at issue in this case does not involve any actions of the federal

government, the plaintiffs' reliance on the Fifth Amendment is "a nullity, and

redundant of [their] invocation of the Fourteenth Amendment Due Process Clause."

*Id.*  With respect to the plaintiffs' Eighth Amendment claim, the Eighth Amendment

"was designed to protect those convicted of crimes."  *Ingraham v. Wright*, 430

U.S. 651, 664 (1977).  Because the injuries alleged by the plaintiffs do not involve

a conviction, their reliance on the Eighth Amendment is misplaced.  With respect to

---

[4] The defendant Louisville Metro Police Department argues that it is not an entity capable of being sued, based in part on *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994), a point which the plaintiffs concede.  *See* DE 19-1 at 20 (stating that "the plaintiffs . . . concede . . . that the Metro Police Department is not an entity which can be sued because it is a branch of and is subsumed by Metro").  Accordingly, the court finds that the plaintiffs' claims against the Louisville Metro Police Department should be dismissed.

the plaintiffs' Ninth Amendment claim, the Ninth Amendment "does not confer substantive rights in addition to those conferred by other portions of our governing law." *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir. 1991). Therefore, the plaintiffs' reliance on the Ninth Amendment is redundant at best. Finally, with respect to the plaintiffs' reliance on the Fourteenth Amendment, "*all* claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen[,]" should be considered "under the Fourth Amendment and its 'reasonableness' standard," rather than under the Fourteenth Amendment and "a 'substantive due process' approach." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis in original). Accordingly, the plaintiffs' claims against both Hargadon *and* Metro which are based on alleged violations of the Fifth, Eighth, Ninth, and Fourteenth Amendments must be dismissed, leaving only the plaintiffs' claims based on the defendants' alleged violations of their rights protected by state law and the Fourth Amendment.

   **2.     Metro's Motion for Summary Judgment**

        **a.     The Plaintiffs' Fourth Amendment Claim**

   42 U.S.C. § 1983 creates a cause of action against local or state officials by providing that "[e]very person who . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights . . . secured by the Constitution and laws, shall be liable to the party injured in an action at law" or another appropriate proceeding. "To prevail in a § 1983 suit against a municipality,

9

a plaintiff must show that the alleged federal right violation occurred because of a municipal policy or custom." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). The proper analysis of a § 1983 claim against a municipality requires the court "to separate two different issues": first, whether the plaintiffs' "harm was caused by a violation"; and second, "if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights*, 503 U.S. 115, 120 (1992) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985)); *see also Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (holding that "[s]ection 1983 does not permit a plaintiff to sue a local government entity on the theory of respondeat superior" and that plaintiffs "may only hold a local government entity liable under § 1983 for the entity's own wrongdoing"). In other words, for a city to be responsible for a constitutional violation and therefore liable under § 1983, its policies must have been "the 'moving force behind the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989) (quoting, inter alia, *Monell*, 436 U.S. at 694 (1978)). Metro argues that it is entitled to summary judgment because even if the plaintiffs can show that Hargadon violated their Fourth Amendment rights, they have wholly failed to show that Metro was in any way responsible for the violation.

The plaintiffs' complaint alleges that Metro violated the plaintiffs' rights by failing to properly train, supervise, and discipline Hargadon. With respect to the failure-to-train claim, the plaintiffs specifically allege that Metro "knew, or should

have known, that Hargadon has not successfully received and/or completed the training that was legally and reasonably required for a person holding his office." (DE 1-1 at 8.)  "[A] systematic failure to train police officers adequately as custom or policy . . . can lead to city liability"; however, "only when the failure to train amounts to 'deliberate indifference' on behalf of the city toward its inhabitants . . . will failure to train lead to city liability under § 1983." *Gregory*, 444 F.3d at 753 (citing *City of Canton*, 489 U.S. at 388-89).  To demonstrate the requisite policy of deliberately indifferent inadequate training, evidence must "be adduced which proves that the inadequacies resulted from conscious choice – that is, proof that the policymakers deliberately chose a training program which would prove inadequate." *Oklahoma City*, 471 U.S. at 823.

In its motion for summary judgment, Metro points out that Hargadon successfully completed 800 hours of basic training as a police recruit, a claim not seriously contested by the plaintiffs. *See, e.g.*, DE 19-1 at 21 (stating that the "plaintiffs are not now in a position to dispute that the basic training program and related policies . . . were facially adequate and that Hargadon completed the basic training").  Despite this initial training, the plaintiffs claim that Metro did not undertake "reasonable efforts to monitor Hargadon's compliance with . . . his initial training[,]" and they argue that this failure to maintain Hargadon's training constituted the requisite policy of deliberately indifferent inadequate training. *Id.* at 22.  Hargadon's training record, however, indicates that he has undergone

11

continuing training throughout his career, including his 2003 successful completion of a course called "Strategies & Tactics of Patrol Stops."  (DE 16-7 at 1.)

While the plaintiffs may be correct that Hargadon did not remember his training – a finding which the court need not and does not make at this time – the undisputed record also reveals that Metro made initial and ongoing efforts to train Hargadon, efforts incompatible with a conclusion that Metro deliberately chose to pursue a general policy of inadequate training.  At best, the plaintiffs have presented indirect evidence that Hargadon's individual training was insufficient, but the fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton*, 489 U.S. at 390-91.  Accordingly, the court finds that Metro is entitled to summary judgment on the plaintiffs' failure-to-train claim.

With respect to their failure-to-supervise claim, the plaintiffs have made allegations even less specific as those supporting their failure-to-train claim.  In general, a plaintiff may pursue at least four avenues to prove the existence of a municipality's illegal policy or custom in a suit under § 1983, one of which is "a policy of inadequate training *or* supervision." *Thomas*, 398 F.3d at 429 (emphasis added).  Such a theory proceeds in a similar fashion to a failure-to-train claim; in such a context, the court should "apply the deliberate indifference standard adopted by the Supreme Court in *City of Canton v. Harris*, to require a showing of a

12

history of widespread abuse that has been ignored by" a municipal defendant. *Berry v. City of Detroit*, 25 F.3d 1342, 1354 (6th Cir. 1994) (internal citations omitted).  The plaintiffs have supplied no evidence to support their failure-to-supervise allegations or to suggest that Metro's supervision or discipline of employees such as Hargadon was in any way deficient, much less a policy of deliberate indifference amounting to a history of widespread abuse.  Indeed, in Hargadon's own case, the undisputed evidence reveals that this incident was Hargadon's first substantial disciplinary episode, that it caused him to be suspended without pay for 10 days, and that he has been notified that "[a]ny conduct of this nature in the future will warrant [his] termination."  (DE 16-6 at 1.)  Accordingly, Metro is entitled to summary judgment on the plaintiffs' failure-to-supervise and failure-to-discipline claims, and therefore, Metro is entitled to summary judgment on all of the plaintiffs' claims for relief under § 1983.

### b.    The Plaintiffs' State-Law Claims

Kentucky's law of sovereign immunity bars state-law actions against county governments.  *E.g., Schwindel v. Meade County*, 113 S.W.3d 159, 163 (Ky. 2003); *see also Bruederle v. Louisville Metro Government*, No. 3:05CV-818-S, 2006 WL 3240814, at *1 (W.D. Ky. Nov. 6, 2006) (analyzing section 231 of the Kentucky Constitution, Ky. Rev. Stat. § 67C.101(2)(e), and Kentucky case law and concluding that Kentucky's sovereign immunity "has also been extended to consolidated local governments, like Louisville Metro").  This immunity extends to

suits against a county for acts committed by its agents, officers, servants, and employees, for "[i]f damages could be recovered against a county on the basis of respondeat superior, the concept of sovereign immunity would be largely nullified because state and county governments perform their ministerial functions by and through their agents, servants, and employees." *Schwindel*, 113 S.W.3d at 163. To waive the sovereign immunity of a county or a consolidated local government, the Kentucky General Assembly must use "'the most express language . . . as will leave no room for any other reasonable construction.'" *Withers v. University of Kentucky*, 939 S.W.2d 340, 346 (Ky. 1997) (quoting *Murray v. Wilson Distilling co.*, 213 U.S. 151, 171 (1909)). The plaintiffs have made no attempt to show that Metro's sovereign immunity from their state-law claims should be waived in this case. Accordingly, the court finds that Metro is entitled to summary judgment on the plaintiffs' state-law claims, and therefore, the court concludes that Metro is entitled to summary judgment on all of the plaintiffs' claims.

**B.    Hargadon's Motion for Summary Judgment**

Hargadon's motion for summary judgment does not address the plaintiffs' state-law claims, and therefore, the court will focus only on Hargadon's argument for summary judgment on the alleged Fourth Amendment violation that forms the basis of the plaintiffs' remaining § 1983 claim. Hargadon claims that he is entitled to summary judgment because the plaintiffs cannot show that a violation of their rights protected by the Fourth Amendment occurred, and therefore, he argues, they

14

cannot establish the first component of a § 1983 claim.  "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing" of the specific "'nature and quality of the intrusion on the individual's Fourth Amendment interests'" at issue in a particular case "against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)).   "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[,]" and "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer['s] actions are 'objectively reasonable' in light of the facts" confronting him, without regard to his "underlying intent or motivation."  *Graham*, 490 U.S. at 396, 397 (citing, inter alia, *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)).  Furthermore, the duty and right of a law enforcement official "to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion[,]" and therefore, "'[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment."  *Graham*, 490 U.S. at 396 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).  In other words, "'[w]hile the law does not require that serious or permanent injuries result'" to find that an officer used excessive force, '"the law does require that the force used be more than the mere technical 'battery' that is inextricably a part of any arrest'"; at

the same time, for example "if handcuffing is accompanied by physical or verbal abuse, or malicious and willful infliction of injury, that might be indicative that [a defendant's] conduct was excessive." *Nemeckay v. Rule*, 894 F. Supp. 310, 315 (E.D. Mich. 1995) (quoting *Bur v. Gilbert*, 415 F. Supp. 335, 341 (E.D. Wis. 1976)); *see also Kostrzewa v. City of Troy*, 247 F.3d 633, 640 (6th Cir. 2001) (holding that if officers "drove recklessly with the plaintiff handcuffed in the back seat so as to cause him further pain and injury, this, by itself," may be enough "to state a claim . . . [for] excessive force").

According to Hargadon, this court "can determine from its own view of the videotape that Officer Hargadon used only the force necessary" to arrest Roberts for at least two reasons: first, the videotape reveals that Hargadon did not draw his weapon while Roberts resisted arrest; and second, the videotape reveals that once Roberts was subdued, Hargadon did not use any force against him at all.  (DE 15-2 at 8.)  Hargadon also claims the videotape reveals that he did not use excessive force in handcuffing Harris and placing her across the front of the police car.  *Id.* Finally, Hargadon points out that the report provided by the plaintiffs' expert, Rodney Brewer, claims only that "numerous protocol violations occurred during the traffic stop including safety and courtesy issues" without ever claiming that Hargadon used excessive force.  (DE 15-7 at 1.)  In response, the plaintiffs claim that the videotape of the incident actually provides detailed support for their claim that Hargadon used excessive force.  The plaintiffs also claim that Metro's own

16

internal investigation supports their claim that Hargadon used excessive force against both of them during the incident.

At this time, the court need not and will not make any finding about the videotape or the parties' conflicting characterizations of the videotape because there is ample additional evidence to dispose of Hargadon's motion for summary judgment.  After watching relevant portions of the tape with Hargadon during Metro's internal investigation of the incident, Lieutenant Greg Mitchell concluded that Hargadon had lost his temper and used unjustified force against the plaintiffs.[5]

---

[5]  More specifically, according to the undisputed transcript, Mitchell made the following comments to Hargadon after they watched portions of the videotape together:

> I have to be honest with you.  You know what it looks like to me?  It looks like you lost your temper with him [Roberts] . . . .

> It was like pouring, putting a match on gasoline or somethin'. . . . there's nothin' I've seen on this video that, that explains or describes or shows that he [Roberts] was that much of an imminent threat.  He was, he had a [sic] attitude, I'll agree with that, but we don't, we don't put people in a control hold just because they've got an attitude, and what I'm saying here is . . . we can sit here for probably till 2 or 3:00 in the morning and have to go through this [videotape] frame by frame for you to try to justify something that doesn't appear to be justifiable on its face.

> If . . . people look at this, are they gonna sit there and actually say that he [Roberts] menaced you?  A reasonable and average person is gonna look at that and say where in the heck is he [Hargadon] getting that? . . . he [Roberts] complied with everything you ask him to do.  And then . . . the minute he disrespects you and says 'dude, what the fuck's your problem,' then it's, the hammer comes down. . . . We can . . . play around with this and mince words and semantics . . . . [but] it looks like you just lost your temper.

17

Moreover, also in the course of Metro's internal investigation of the incident, Major Vincent Robison prepared a report, in which he found that Hargadon "used too much physical force" against both of the plaintiffs and concluded, with respect to Hargadon's treatment of Harris, that "[i]f this is not excessive force, then it is in my opinion at least another violation of the courtesy policy." (DE 21-13 at 1.) Contrary to Hargadon's assertions, a jury could conclude that Hargadon's actions amounted to more than a mere violation of standard police procedures based on this evidence. Finally, although the plaintiffs' own expert never uses the words "excessive force" in his report, he does conclude that "Hargadon appears to have escalated the level of force above the point necessary to resolve the conflict" while exhibiting "somewhat aggressive and disrespectful behavior . . . and unnecessary physical tactics . . . unwarranted for the circumstances at hand." (DE 15-8 at 5-6.) When all reasonable inferences are drawn from these and other documents in the light most favorable to the plaintiffs, the plaintiffs have shown the existence of genuine and material issues for trial, making further analysis of the parties' conflicting characterizations of the videotape unnecessary at this time. Accordingly,

**IT IS ORDERED** that the motions to dismiss and for summary judgment (DE 16) filed by Metro and the Louisville Metro Police Department are **GRANTED**. All of the plaintiffs' claims against the Louisville Metro Police Department are

---

(DE 21-12 at 24-25, 30.)

dismissed.  The plaintiffs' claims against both Metro and Hargadon based on the alleged violations of the plaintiffs' rights protected by the Fifth, Eighth, Ninth, and Fourteenth Amendments are also dismissed.  The plaintiffs' state-law claims against Metro are also dismissed.  Finally, Metro is entitled to summary judgment on the plaintiffs' remaining claim against Metro based on the alleged violation of the plaintiffs' rights protected by the Fourth Amendment.

**IT IS FURTHER ORDERED** that Hargadon's motion for summary judgment (DE 15) is **DENIED**.

Signed on  July 9, 2007

*Jennifer B Coffman*

**Jennifer B. Coffman, Judge**
**United States District Court**